# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

| | |
|---|---|
| EDGAR QUINTANILLA,<br><br>   Plaintiff,<br><br> v.<br><br>HOMER BRYSON, et. al.,<br><br>   Defendants. | CIVIL ACTION NO.: 6:17-cv-4 |

## O R D E R

Presently before the Court is Defendants' Motion for Summary Judgment, (doc. 88). Plaintiff Edgar Quintanilla, an inmate incarcerated by the Georgia Department of Corrections (at times, the "GDC"), filed this 42 U.S.C. § 1983 action alleging constitutional violations related to his time in GDC's "administrative segregation" program. (Doc. 80.) The parties dispute whether Defendants Homer Bryson, Robert Toole, Otis Stanton, Doug Williams, Eric Smokes, Deric Godfrey, Gregory Dozier, Scherika Wright, Yolanda Byrd, and Steve Upton complied with the Due Process Clause of the Fourteenth Amendment when assigning and retaining Plaintiff in the program, and whether Defendants are entitled to qualified immunity.[1] (Id.; doc. 88.) Based on

---

[1] In his Second Amended Complaint, Plaintiff asserts Section 1983 claims pursuant to both the Eighth and Fourteenth Amendments. (Doc. 80.) However, after Defendants filed the at-issue Motion, Plaintiff filed a Motion to Dismiss his Eighth Amendment claim (Count II) without prejudice, (doc. 96). Accordingly, the Court **GRANTS** Plaintiff's Motion, (id.), and **DISMISSES without prejudice** Count II of Plaintiff's Second Amended Complaint.

 Additionally, it is unclear whether Plaintiff intended to assert his Fourteenth Amendment claim against Defendant Wright as his Second Amended Complaint does not allege that Wright was involved in the events giving rise to that claim. (Id. at pp. 20–21.) To the extent he wished to assert such a claim, however, Plaintiff does not address Wright—or her involvement—in his Response to the Motion for Summary Judgment, (doc. 94). As such, Plaintiff failed to create any genuine disputes of material fact surrounding

the undisputed facts before it, the Court finds that Plaintiff has failed to support his 42 U.S.C. §

1983 claim with sufficient evidence to survive summary judgment. Moreover, Defendants are

shielded from Plaintiff's claim by qualified immunity. Accordingly, the Court **GRANTS**

Defendants' Motion for Summary Judgment, (doc. 88). The Court **DIRECTS** the Clerk of Court

to enter the appropriate judgment of dismissal and to **CLOSE** this case.

## BACKGROUND

### I.    Procedural History

On January 9, 2017, Plaintiff, proceeding *pro se*, filed this cause of action pursuant to 42

U.S.C. § 1983, alleging injury from his assignment to Smith State Prison's "Tier II administrative

segregation program." (Doc. 1.) After retaining counsel, Plaintiff filed an Amended Complaint,

(doc. 51), and a Second Amended Complaint, (doc. 80). Plaintiff asserts that Defendants Bryson,

Toole, Stanton, Williams, Smokes, Godfrey, Dozier, Byrd, and Upton, in their individual

capacities, violated the Due Process Clause of the Fourteenth Amendment. (Id.) Defendants filed

the at-issue Motion for Summary Judgment on July 15, 2019. (Doc. 88.) Plaintiff filed a Response,

(docs. 94, 95), and Defendants filed a Reply, (doc. 98).

### II.   Factual Background

The events giving rise to this action began on March 23, 2016, when a fight broke out

between inmates at Wheeler Correctional Facility (hereinafter, "Wheeler"). (Doc. 84, pp. 2, 5.)

After the fight, Plaintiff, an inmate at Wheeler, was transferred to Smith State Prison (hereinafter,

"Smith") on March 25, 2016. (Doc. 95, p. 1; doc. 80, p. 2.) On April 4, 2016, Plaintiff was

assigned to Smith's "Tier II administrative segregation program" for his participation "as a leader"

---

Wright's liability for his alleged Fourteenth Amendment injury and she is entitled to judgment in her favor.
Accordingly, the Court **GRANTS** Defendants' Motion as to Defendant Wright, (doc. 88).

in the March 23 altercation at Wheeler. (Doc. 95, pp. 1, 9.)  Plaintiff's Tier II status was reviewed intermittently until he was released from the Tier II program on March 6, 2018. (Id. at pp. 10–13.)  The relevant details are discussed below.

A.    **Tier II Program Overview**

The Tier II program "is an offender management process" established by the GDC "to protect staff, offenders, and the public from offenders[] who . . . pose a serious threat to the safety and security of the institutional operation." (Doc. 88-5, p. 2.)  Governed by Standard Operating Procedure IIB09-0003 (hereinafter, the "SOP"), the program is an "[a]dministrative [s]egregation stratification plan that manages the institutional conduct and programmatic need of offenders assigned to the program." (Id. at p. 4; doc. 94-26, pp. 3–4.)  The Tier II program is not punitive in nature; rather, it is an incentive program consisting of different phases, each offering increased privileges to offenders based on appropriate behavior and program compliance. (Doc. 88-5, pp. 2, 4.)  In general, offenders start the program in Phase 1, the most restrictive phase, then move to Phase 2, Phase 3, and, with respect certain inmates, Phase 3+. (Doc. 95, p. 3.)

As demonstrated in Figure 1 below, each phase of the Tier II program corresponds with an increased amount of inmate privileges. (Figure 1; Doc. 88-5, p. 22.)  Specifically, higher phases correspond with the ability to: have more personal property; spend more money at the commissary; make one or two more phone calls per month; have additional visitation time; and enroll in facility programming. (Figure 1; Doc. 88-5, p. 22.)  Regardless of phase, however, the SOP states that inmates in all phases of the Tier II should have: the opportunity for personal hygiene three times per week; food of the same quality and quantity as that provided to inmates in general population; and the opportunity to exercise a minimum of five hours per week. (Id. at p. 3; doc. 88-5, pp. 7–

8.) Additionally, all Tier II inmates are strip searched before they are permitted to leave their cells.

(Doc. 95, p. 3.)

## Administrative Segregation: Tier II Conditions and Privileges

| | PHASE 1 | PHASE 2 | PHASE 3 | PHASE 3+ |
|---|---|---|---|---|
| PERSONAL PROPERTY | Limited to State Issued Only (see below) | Limited to State Issued Only (Hygiene items/see below ) | Limited (Hygiene items, photo albums/see below) | All Personal Property with the exception of restricted administrative segregation items<br><br>May have CD player, up to 10 CD's, 4 batteries, 1 headphone. |
| COMMISSARY | (legal supplies only) | $15 for commissary (legal and hygiene items only) | $30 for commissary (restricted store list) | Up to $40 for commissary (restricted store list) |
| TELEPHONE | (1)-15 min call per month | Up to (2)-15 min call per month | Up to (3)-15 min call per month | Up to (3)-15 min call per month |
| RECREATION | 5 hours per week | 5 hours per week | 5 hours per week | 5 hours per week |
| TELEVISION | None | None | None | None |
| VISITATION | 1 non-contact per month for up to 2 hours (2 visitors only) | Up to 2 non-contact per month for up to 2 hours (2 visitors only) | Up to 3 non-contact per month for up to 2 hours (2 visitors only) | Up to 3 non-contact per month for up to 2 hours (2 visitors only) |
| CLOTHING | State issued jumpsuits and footwear | State issued jumpsuits and footwear | State issued jumpsuits and footwear | State issued jumpsuits and footwear |
| PROGRAMMING | In-Cell as Available after 5th week of assignment | In-Cell or Restricted Small Groups as Available Determined by Program Plan | In-Cell or Restricted Small Groups as Available Determined by Program Plan | Life Skills and Re-Entry as available |
| MAIL | Personal/Legal Mail excludes pictures (see below) | Personal/Legal Mail excludes pictures (see below) | Personal/Legal Mail (see below) | Personal/Legal Mail (see below) |
| SECUREPAK/ HOLIDAY PACKAGES | None | None | None | All with the exception of restricted administrative segregation items |
| LIBRARY | LEGAL (per institutional schedule) | LEGAL (per institutional schedule) | GENERAL AND LEGAL (per institutional schedule) | GENERAL AND LEGAL (per institutional schedule) |
| RESTRAINTS | Handcuffs at a minimum | Handcuffs at a minimum | Handcuffs at a minimum | Handcuffs at a minimum |

Figure 1 (Doc. 88-5, p. 22.)

### (1) Assignment to Tier II

The SOP establishes the "criteria and guidelines for assigning offenders into the program." (Doc. 88-5, p. 2.) An offender can be assigned to Tier II for one of several reasons, including leadership or participation in a major disturbance, major disruptive event, or riot within the last five years. (Id. at p. 5; doc. 95, p. 7.) When an inmate is recommended for a facility's Tier II program, a "Classification Committee" at that facility—comprised of the Tier II Unit Manager, the Tier II Officer in Charge, and, as applicable, the offender's assigned counselor—reviews all recommendations and determines an inmate's eligibility based on the criteria listed in the SOP. (Doc. 88-5, pp. 3, 6.) The Classification Committee then submits its recommended course of

action directly to the Warden or his designee, who must review and approve or deny the recommendation within seven business days. (Id. at p. 6.) If a recommendation for placement in the Tier II program is approved, the inmate will receive written notification of the decision. (Id. at p. 7.) Additionally, the Classification Committee is required to hold an administrative segregation hearing within 96 hours of the inmate's placement in segregation.[2] (Id. at pp. 3, 6; doc. 95, p. 7.) An inmate may appeal his assignment to the Tier II program by submitting written objections to the Director of Facilities Operations (the "Director") or his designee within three business days from receipt of the notice. (Doc. 95, p. 8; doc. 88-5, p. 7.) The Director must review the offender's appeal within fourteen business days of receipt. (Doc. 88-5, p. 7.)

(2)      **Progression Through Tier II**

Once an inmate is assigned to Tier II, his counselor should review his "well-being and mental status" every seven days. (Id.) The counselor may also complete "informal 30-day contacts . . . as part of the[ir] routine case management." (Id. at p. 9.) Additionally, under the SOP, the Classification Committee must evaluate an inmate's status in the Tier II program at least every 90 days. (Doc. 95, p. 8.) Referred to as a "90-Day Review," this evaluation "is a culmination of the previous informal . . . contacts that have been completed as part of the routine case management practices," (doc. 88-5, p. 9), and the Committee formulates a recommendation regarding the inmate's disposition in the program. (Doc. 95, p. 8.) Specifically, the Committee must determine whether the offender will: remain in his current phase of the program; transition to the next phase; be reassigned to a previous phase; or, once all phases have been completed, be assigned to the Tier

---

[2] The offender also must be given a copy of an Administrative Segregation Memo stating the reason for his segregation and explaining that, while he may request that witnesses speak on his behalf at his hearing, the decision to call witnesses is within the discretion of the Classification Committee. (Doc. 95, p. 7.)

I program or general population.  (Id.; doc. 88-5, pp. 9–10.)  To formulate a recommendation, the Committee considers many factors, including: number, type, and frequency of disciplinary reports; length of time in the current phase; continued facility risk; demeanor with staff in living areas and during periodic reviews; and progress in the mandatory "O.U.T. program," a 40-week "cognitive behavior" course.  (Doc. 88-5, p. 10; doc. 95, p. 8; doc. 94-3, p. 4.)  While an inmate may progress through the program in as few as 270 days (three 90-day phases), any of the aforementioned factors can be cause for retention or regression.  (Doc. 95, p. 8; doc. 94-3, p. 4.)  The Classification Committee's ultimate recommendation is submitted to the Warden, and, if approved, the inmate is given a copy of the recommendation.  (Doc. 95, p. 8.)  As with initial placement in the Tier II program, the inmate may submit an appeal of the 90-Day Review to the Warden within three business days of receiving the notice.  (Id. at p. 9.)  The Warden or designee has seven business days to complete a review.  (Doc. 88-5, p. 11.)

The SOP outline additional procedures for when release from Tier II or assignment to Tier I is found to be appropriate.  (Doc. 88-5, p. 11.)  First, the Tier II Unit Manager or designee reviews an inmate's case file and forwards the at-issue recommendation to the Warden and Regional Director.  (Id. at p. 12.)  If the offender is "recommended for release," his name "shall be forwarded electronically to the Criminal Investigations Unit STG Coordinator" (hereinafter, "STG Coordinator") who will "investigate the offender for any documented Security Threat Group Activities."  (Id.)  This investigation should be completed within ten days, and the STG Coordinator "is responsible for advising the Regional Director and the Tier Segregation Manager, electronically, of any [pertinent] information."  (Id.)  The decision is eventually transmitted to the Tier Segregation Manager to direct the offender's placement accordingly.  (Id.)  If the inmate's

release is approved, he must be monitored in Tier I for up to 30 days prior to returning to general population "as a part of [his] reorientation to a less strict environment." (Id. at p. 11.)

### B. Plaintiff's Time in Tier II at Smith

#### (1) Assignment Process

As noted above, Plaintiff was an inmate at Wheeler prior to his time in Tier II at Smith. (Doc. 95, p. 9.) On March 23, 2016, a fight broke out between seven Hispanic and nineteen black Wheeler inmates. (Doc. 94-21, p. 26.) Plaintiff was transferred to Smith on March 25, 2016 and, after his initial segregation hearing three days later, he was placed in Tier I "pending Tier II assignment." (Id.; doc. 95, p. 9.) In an entry dated March 30, 2016, Plaintiff's electronic case file stated that Plaintiff was "directly involved" in the incident and admitted to "UM Hamilton," the author of the case note, that he threw his roommate's property out of their cell. (Doc. 94-21, p. 26.) The note further stated that "UM Hamilton discover[ed] after reviewing Milestone Camera system that [Plaintiff] did fight with [another inmate] on the top range of 500D." (Id.) Two subsequent reports about the fight, both dated April 1, reiterated this contention; a document titled "Incident Report" categorized the fight as "disruptive behavior," and labeled over twenty inmates, including Plaintiff, as "directly involved," (doc. 94-20, p. 7), and a document titled "Supplemental Report" identified Plaintiff as an involved party, (id. at p. 3).[3]

On April 4, 2016, Plaintiff had a hearing with the Classification Committee at Smith. (Doc. 95, p. 9; doc. 94-14, p. 3.) Defendant Smokes (the then-Tier II Unit Manager) and Defendant Godfrey (the Tier II Officer in Charge) were two of the three Committee members.[4] (Doc. 94-14,

---

[3] Both reports have the phrase "Incident Not Video Taped" next to the prompt "Incident Video Taped By:" but also indicate that a video of some kind was reviewed. (See doc. 94-20, pp. 2–6.)

[4] The record does not identify the third member of the Classification Committee or how long Smokes and Godfrey remained on Plaintiff's Classification Committee at Smith. Godfrey testified that he "thinks" he

p. 5; doc. 94-8, pp. 5, 15.)  According to Godfrey, Smokes was the "committee leader."  (Doc. 94-14, p. 3.)  Prior to the hearing, Smokes reviewed Plaintiff's file and observed that other officials had already designated Plaintiff as "Tier I pending Tier II."  (Doc. 94-8, p. 3.)  He then read the Incident Report and the March 30 case note, (id. at pp. 3, 8, 10), and relayed the information to the other members of the committee, (doc. 94-14, p. 3).  Additionally, Plaintiff told Smokes that he "was not seen fighting on [any] camera system at Wheeler."  (Doc. 94, pp. 13–14; doc. 94-22, p. 2.)  The Committee ultimately recommended that Plaintiff be assigned to Phase 1 of Tier II for "participation as a leader in a major disruptive event disturbance at Wheeler" and his direct involvement in the fight, and the Committee informed Plaintiff of their decision at the April 4 hearing.  (Doc. 94-22, p. 2; doc. 95, p. 9.)  Defendant Williams, the Warden at Smith, approved the recommendation that same day.  (Doc. 94-22, p. 2; doc. 94-21, p. 26.)  Plaintiff appealed this decision; his appeal form was sent to Defendant Upton, the Director of Field Operations, via his designee, Defendant Stanton.  (Doc. 94-23, p. 2; doc. 94-13, p. 3.)  In his appeal, Plaintiff again stated that there was no video footage of him fighting with anyone and asked Stanton to personally review the recordings.  (Doc. 94-23, p. 3.)  On April 12, 2016, Stanton denied Plaintiff's appeal, stating that Plaintiff "met [the] criteria for Tier II."  (Id.)  Stanton testified that he did not review video footage because the incident report identified Plaintiff as a participant.  (Doc. 94-3, p. 4.)

### (2)    Plaintiff's Subsequent Hearings

Throughout his time in the Tier II program, Plaintiff had regular seven- and thirty-day contacts with various individuals and these visits were documented in his electronic case file.  (Doc. 94-21.)  Additionally, the Classification Committee reviewed Plaintiff's status on at least

---

attended all of Plaintiff's subsequent 90-Day hearings, discussed below.  (Doc. 94-14, p. 5.)  Defendant Byrd eventually replaced Smokes as Tier II Unit Manager, (see doc. 94-24, p. 2), and, pursuant to the SOP, Byrd eventually replaced Smokes as a member of the Classification Committee, (doc. 88-5, pp. 3, 6).

seven occasions by way of 90-Day Reviews. (Doc. 95, pp. 9–13.) At his first review, the Classification Committee recommended that Plaintiff be reassigned from Phase 1 to Phase 2; at his second review, the Committee recommended that he be reassigned to Phase 3.[5] (Doc. 95, p. 10.) Williams approved both recommendations. (Id.) The case notes indicate these recommendations were based on Plaintiff's improved behavior and positive participation in the program. (Id.; doc. 94-21, p. 23.) On December 26, 2016, Plaintiff had his third 90-Day Review. (Id. at p. 18.) He had completed the O.U.T. program prior to the review and the Classification Committee recommended that Plaintiff be retained in Phase 3 while his release paperwork was reviewed. (Doc. 95, p. 10.) Williams approved the release recommendation on December 28. (Id.) According to Williams, he generally forwarded recommendations for release to Upton every time he received one, as required by the SOP.[6] (Doc. 89-1, pp. 1, 8–9.)

In January 2017, Plaintiff received a Disciplinary Report ("DR") for "defacing state property." (Doc. 94-21, pp. 16–17.) According to Plaintiff's records, the Classification Committee had a 90-Day Review hearing with Plaintiff on March 16, 2017, during which Plaintiff disputed the disciplinary report, claiming it was "not right." (Id. at p. 16; doc. 88-7, p. 21.) The Committee recommended that Plaintiff be retained in Phase 3 due to his DR. (Doc. 88-7, p. 21.) In June 2017, Defendant Byrd replaced Smokes as Tier II Unit Manager and as a member of the Classification Committee. (Doc. 84, p. 9.) On June 16, Byrd met with Plaintiff to discuss his confinement; Byrd classified the meeting as Plaintiff's 90-Day Review. (Doc. 84, p. 9.) Byrd told Plaintiff the Classification Committee recommended that he remain in Phase 3 while review of his

---

[5] Plaintiff's first 90-Day Review was on July 1, 2016, and his second Review was on September 26, 2016. (Doc. 94-21, pp. 21, 23.)

[6] Williams further testified that he forwarded the appropriate documents every time he received a recommendation for release. (Doc. 89-1, p. 24.)

release paperwork continued and that Williams had approved this recommendation.[7] (Id.; doc. 94-21, p. 13.) Plaintiff appealed the March and June decisions to retain him in Phase 3, arguing that he "was not provided a policy-mandated review hearing" on either occasion. (Doc. 88-7, pp. 22, 25.) Williams denied the appeals. (Id.) In his deposition, Williams testified that he would not have signed the form without confirming that the 90-Day Review had occurred. (Doc. 94-12, p. 6.) However, the forms containing Williams' denial did not state any reasons for the decisions. (Doc. 88-7, pp. 22, 25.)

Plaintiff completed the O.U.T. program for a second time in May 2017. (Doc. 94, p. 19.) On June 25, 2017, Byrd sent the Deputy Warden an email recommending that Plaintiff be released from Tier II and returned to general population after the requisite thirty days of monitoring in Tier I. (Doc. 89-1, p. 7; doc. 94-24, p. 2.) At the next 90-Day Review on September 13, 2017, the Committee again recommended that Plaintiff remain in Phase 3 pending review of his release paperwork. (Doc. 95, p. 12.) Plaintiff appealed the decision, asking to be released to general population, and Williams denied the appeal without additional explanation.[8] (Id.; doc. 88-7, p. 28.)

On October 12, 2017, Byrd sent Smith another email recommending that Plaintiff be released to general population. (Doc. 89-1, p. 11.) The next day, Byrd sent this recommendation to Williams, (doc. 89-1, p. 11), and "Statewide Tier Management," (doc. 94-21, p. 9). Williams forwarded the email to Defendant Toole, the Deputy Director of Field Operations, on October 16, indicating that he agreed with Byrd's recommendation for release. (Doc. 89-1, p. 12; doc. 94-12,

---

[7] According to his electronic case notes, Plaintiff's phone and mail restrictions ended on April 30, 2017. (Doc. 94-21, p. 15.)

[8] In his deposition, Williams said that Plaintiff remained in Tier II because Upton had not yet approved or denied the recommendation for release. (Doc. 89-1, p. 8.)

p. 7; doc. 80, p. 5.)  Toole responded on October 20 and told Williams to assign Plaintiff to Phase 3+ rather than Tier I, a decision that had been approved by Upton.  (Doc. 89-1, p. 12.)  On October 23, 2017, the Classification Committee recommended that Plaintiff be reassigned to Phase 3+ "per TIER statewide management due to [the incident] at Wheeler CI on 3-23-16."  (Doc. 88-7, p. 30; doc. 94-21, p. 9.)  Byrd met with Plaintiff at his cell to inform him that Williams approved the Phase 3+ recommendation.  (Doc. 84, p. 9.)  Williams denied Plaintiff's subsequent appeal.  (Doc. 95, p. 12.)

Plaintiff had another 90-Day Review in January 2018, and the Classification Committee again recommended that Plaintiff remain in Phase 3+ pending release documentation.  (Doc. 95, p. 13.)  On January 26, Byrd informed Plaintiff that Williams had accepted the recommendation. (Doc. 84, p. 10.)  On March 6, 2018, Toole sent an email to over a dozen individuals, including Upton and Stanton, recommending the Tier II release of over 204 inmates throughout the state. (Doc. 94-25, p. 2; doc. 94, p. 22.)  Plaintiff was one of the identified inmates.  (Doc. 94, p. 22.) The email indicated the inmates were selected pursuant to the "Tier II Administrative Review" that occurred in February 2018 and directed the email recipients to "get with [their] Wardens" and initiate the "moves." [9]  (Id.)  On March 7, 2018, Plaintiff was reassigned to Tier I pursuant to this directive.  (Id.)

### (3)    Conditions of Confinement

While in Tier II at Smith, Plaintiff's living conditions differed from those in Smith's general population.  First, general population inmates were permitted to go outside to exercise or

---

[9]  This review was a part of an initiative lead by Defendant Dozier, who worked as chief of staff for GDC and succeeded Defendant Bryson as Commissioner of GDC in December 2016.  (Doc. 94-5, p. 3; doc. 80, pp. 4–5; doc. 84, p. 4.)  According to Dozier, the initiative was aimed at reducing the number of inmates in administrative segregation by identifying "additional avenues for changing behavior."  (Doc. 94-5, p. 6.)

participate in activities "whenever the yard was open," which could be several hours per day. (Doc. 94, pp. 8–9; doc. 94-8, p. 13.) While outside, these inmates could roam freely within the yard and interact with one another. (Doc. 94-8, pp. 13–14.) As a Tier II inmate, Plaintiff was restricted to an outdoor, individual enclosure, and he was periodically limited to less than five hours of outdoor activity per week (in violation of the SOP). (Doc. 94, pp. 6, 9; doc. 98, p. 2.) Additionally, inmates in general population had more regular access to drinking water than Plaintiff did. (Doc. 94-1, p. 1.) General population inmates could obtain water from the waterspouts connected to their sinks or the water faucet located in the main area of the dorm. (Id.) While Tier II cells at Smith have water faucets, inmates did not have regular access to a second water source and the faucet in Plaintiff's cell did not work for approximately one week in January 2018; during this period, Plaintiff was limited to "cups of ice" that came with his meals. (Doc. 94, pp. 7–8; doc. 94-9, p. 17.) Plaintiff's Tier II cell also lacked working lightbulbs for several weeks during his confinement. (Doc. 94-9, p. 16; doc. 94-1, p. 2.) By contrast, Plaintiff testified that lightbulbs in general population at Smith would typically be replaced within twenty-four hours. (Doc. 94-1, p. 2.) Finally, as a Tier II inmate, Plaintiff was strip-searched every time he left his cell, while general population inmates are rarely subjected to such searches. (Doc. 94-9, p. 14.)

### C. Review of Each Defendant's Involvement

Because all Defendants move for summary judgment, it is imperative to establish the extent of each one's involvement based on the record before the Court.

### (1) Defendants Bryson and Dozier

Bryson served as Commissioner of the GDC until December 2016. (Doc. 80, p. 4; doc. 84, p. 4.) Dozier worked as chief of staff for GDC until he replaced Bryson as Commissioner of GDC. (Doc. 94-5, p. 3; doc. 80, p. 5; doc. 84, p. 4.) Dozier worked on a GDC initiative to reduce the

number of inmates in administrative segregation by identifying "additional avenues for changing behavior." (Doc. 94-5, p. 6.)

### (2)     Defendants Upton and Stanton

Upton was the Director of Field Operations for GDC. (Doc. 80, p. 5; doc. 84, p. 4.) Stanton served as Upton's designee. (Doc. 84, p. 5.) In April 2016, Stanton reviewed and denied Plaintiff's appeal of his assignment to Tier II, stating that Plaintiff "met [the] criteria." (Id. at p. 7.) Stanton testified that he did not review video footage because the incident report identified Plaintiff as a participant. (Doc. 94-3, p. 4.) In October 2017, Upton approved the recommendation to assign Plaintiff to Phase 3+ rather than Tier I. (Doc. 89-1, p. 12.)

### (3)     Defendant Toole

Toole was the GDC Regional Director for the Southeast Region. (Doc. 80, p. 5; doc. 84, p. 4.) In an October 2017 email, Toole instructed Williams to assign Plaintiff to Phase 3+ rather than Tier I, a decision that had been approved by Upton. (Doc. 89-1, p. 12.)

### (4)     Defendant Williams

Williams was the Warden at Smith at all times relevant to this action. (Doc. 80, p. 5; doc. 84, p. 4.) Williams signed off on the Classification Committee's initial recommendation to assign Plaintiff to Tier II, (doc. 94-22, p. 2), and the subsequent recommendations that Plaintiff be reassigned to higher phases, retained in his current phase, or released from the Tier II program, (doc. 95, p. 10; doc. 94-12, p. 8). Williams also denied each of Plaintiff's appeals of these decisions. (Doc. 88-7, pp. 22, 25, 28.) However, Williams testified that he forwarded the recommendations for release to Upton every time he received them, as required by the SOP. (Doc. 89-1, pp. 1, 8–9, 24.)

### (5) Defendants Smokes and Godfrey

Smokes was the Tier II Program Unit Manager at Smith until June 2017, and Godfrey was Smith's Tier II Program Officer in Charge. (Doc. 84, pp. 4, 17.) Smokes and Godfrey served on the Classification Committee that recommended Plaintiff's initial assignment to Tier II. (Doc. 94-14, p. 5; doc. 94-8, pp. 5, 15.) To make this decision, Smokes testified that he looked to Plaintiff's status as "Tier I pending Tier II," the Incident Report, and the March 30 case note. (Doc. 94-8, pp. 3, 8, 10.) Smokes then relayed the information to Godfrey. (Doc. 94-14, p. 3.)

### (6) Defendant Byrd

Byrd replaced Smokes as the Tier II Unit Manager and thereby became a member of the Classification Committee in June 2017. (Doc. 95, p. 13.) In June 2017, September 2017, October 2017, and January 2018, Byrd informed Plaintiff of the respective decisions to retain him in Tier II while his release paperwork was reviewed. (Doc. 84, pp. 9–10.) Byrd sent emails recommending Plaintiff's release from Tier II in June and October of 2017. (Doc. 89-1, pp. 7, 11; doc. 94-24, p. 2.)

### STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v.

Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted).

**DISCUSSION**

**I.    42 U.S.C. § 1983: Fourteenth Amendment Procedural Due Process**

Plaintiff asserts that Defendants are liable in their individual capacities pursuant to 42 U.S.C. § 1983 for deprivations of his procedural due process rights in violation of the Fourteenth Amendment.  (Doc. 80, pp. 19–20.)  Plaintiff argues that he had a protected liberty interest in avoiding the harsh conditions of Tier II and that: (1) Defendants Smokes, Godfrey, Williams, and Stanton did not afford him adequate process in his Tier II assignment; (2) Defendants Byrd, Williams, Toole, and Upton's actions caused him to remain in Tier II for longer than necessary; and (3) Defendants Bryson and Dozier implemented and maintained the system that led to these problems.  (Id.)  In their Motion, all Defendants argue that Plaintiff's claim fails as a matter of law because the record demonstrates they did not run afoul of the Fourteenth Amendment.  (Doc. 88-1.)  Specifically, Defendants maintain that Plaintiff's conditions of confinement were not "atypical and significant" as contemplated by the due process clause and that Plaintiff "received fair and adequate process."  (Id. at p. 1.)  However, even if a constitutional violation did occur, Defendants contend they cannot be held liable because they are entitled to qualified immunity.  (Id. at pp. 16–17.)

For the reasons set forth below, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's claim and, in the alternative, are entitled to qualified immunity.

**A**.    **Defendants Bryson and Dozier: Supervisory Liability**

Plaintiff asserts that Bryson and Dozier are liable in their individual capacities as Commissioners of GDC for the allegedly unconstitutional procedures that resulted in Plaintiff's assignment to Tier II and his retention thereafter.  (Doc. 80, p. 20.)  While supervisors can be liable for constitutional violations committed by their employees or supervisees in certain situations,

such liability is contingent on an underlying constitutional violation.  See Beshers v. Harrison, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007) ("We need not address the Appellant's claims of . . . supervisory liability since we conclude no constitutional violation occurred."); see also Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999) (claims for supervisory liability fail without underlying constitutional violation).  As laid out below, the Court concludes that Plaintiff's Section 1983 claim fails due to his inability to establish a constitutional violation.  However, even assuming any underlying violations occurred, Bryson and Dozier are nonetheless entitled to judgment in their favor.

Liability under Section 1983 cannot attach based merely on a defendant's supervisory status.  Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009).  A supervisor may be liable only where a plaintiff can show:

> (1) the supervisor's personal involvement in the violation of his constitutional rights, (2) the existence of a custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights, (3) facts supporting an inference that the supervisor directed the unlawful action or knowingly failed to prevent it, or (4) a history of widespread abuse that put the supervisor on notice of an alleged deprivation that he then failed to correct.

Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam) (citing West v. Tillman, 496 F.3d 1321, 1328 (11th Cir. 2007)); see also Belcher v. City of Foley, 30 F.3d 1390, 1396–97 (11th Cir. 1994) (while "[s]upervisory officials are not liable under section 1983 on the basis of respondeat superior or various liability[,] [t]hey may . . . be liable . . . when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation") (citations and internal quotation marks omitted).

Here, Plaintiff has failed to demonstrate that any of these avenues provides a basis to hold Bryson or Dozier liable for the alleged violations of his constitutional rights.  In his Response, Plaintiff invokes the fourth method of proving supervisory liability outlined above, arguing that a

"history of widespread abuse" put both Defendants "on notice of the need to correct the alleged deprivation, [yet they] failed to do so." Barr, 437 F. App'x at 875. Plaintiff points to a report written by a GDC consultant stating that, at several Tier II facilities throughout the state, inmates were not receiving sufficient yard time. (Doc. 94, p. 24.) However, Plaintiff does not point to *any* evidence concerning the assignment or review procedures at Smith—or any Tier II facility—that would put Bryson or Dozier on notice of the at-issue violations alleged in this case. Finally, Plaintiff has not argued—much less presented evidence to show—that Bryson or Dozier: personally participated in any alleged deprivation of his constitutional rights; maintained a custom or policy that resulted in deliberate indifference to his constitutional rights; or directed and/or knowingly failed to prevent any unlawful actions as to him. Accordingly, even when viewing the record in the light most favorable to him, Plaintiff has failed to meet the "extremely rigorous" evidentiary burden of proving supervisory liability in regard to his Section 1983 claim, and Bryson and Doering are entitled to judgment in their favor. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003); see also Gandy v. Bryson, No. 5:16-CV-44, 2016 WL 4385851, at *3 (S.D. Ga. Aug. 15, 2016), adopted by No. 5:16-CV-44, 2016 WL 4881154 (S.D. Ga. Sept. 12, 2016) (granting summary judgment on supervisory liability claim against GDC Commissioner).

**B.    Defendants Smokes, Godfrey, Byrd, Williams, Stanton, Toole, and Upton**

As noted above, Plaintiff asserts that Defendants Smokes, Godfrey, Byrd, Williams, Stanton, Toole, and Upton violated his Fourteenth Amendment procedural due process rights by assigning him to Tier II without a proper investigation and failing to provide "meaningful" reviews of his status. (Doc. 80, pp. 19–20.) The Due Process Clause of the Fourteenth Amendment provides no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Where, as here, a plaintiff-prisoner asserts a due process

claim in relation to his confinement in a state prison, he must establish "three elements: (1) a deprivation of a constitutionally-protected liberty . . . interest; (2) state action; and (3) constitutionally-inadequate process." <u>Grayden v. Rhodes</u>, 345 F.3d 1225, 1232 (11th Cir. 2003). Here, the parties dispute whether Plaintiff has put forth sufficient evidence to satisfy the first and third elements. (Doc. 88-1, pp. 11–13.) The Court will address each issue in turn.

### (1) Deprivation of a Constitutionally-Protected Liberty Interest

As to the first element, whether there has been a showing of a "depriv[ation] of 'liberty' within the meaning of the Fourteenth Amendment . . . is often a difficult determination in the context of a prison, because prisoners have *already* been deprived of their liberty in the ordinary sense of the term." <u>Bass v. Perrin</u>, 170 F.3d 1312, 1318 (11th Cir. 1999). Indeed, it is well-established that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005) (citing <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (1976)). Nevertheless, the Supreme Court has identified "two circumstances in which a prisoner can be further deprived of his liberty such that due process is required." <u>Bass</u>, 170 F.3d at 1318. First, a protected due process liberty interest arises "when a change in [the] prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court." <u>Id.</u> The second type of liberty interest is state-created and arises "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" <u>Kirby v. Siegelman</u>, 195 F.3d 1285, 1291 (11th Cir. 1999) (quoting <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995)).

Plaintiff's claim concerns the latter class of liberty interests. Plaintiff alleges that his time in Tier II "constitutes an atypical and significant hardship relative to the ordinary incidents of life in Georgia prisons." (Doc. 80, p. 19.) In support of this contention, he points to Wilkinson v. Austin, 545 U.S. 209 (2005). (Doc. 94, pp. 4–5.) In Wilkinson, the United States Supreme Court held that prisoners had a liberty interest in avoiding assignment to an Ohio "Supermax" prison because the conditions were "atypical and significant" relative to the general prison population. 545 U.S. 209, 223–24 (2005). Specifically, almost all human contact was prohibited, "even to the point that conversation [was] not permitted from cell to cell;" a light in each cell shined on the prisoners 24 hours per day, and inmates who attempted to shield the light to sleep were subject to further discipline; and the prisoners' exercise was limited to one hour per day and limited to a "small indoor room." Id. at 214, 224. Placement in the Supermax program also disqualified otherwise eligible inmates from parole consideration, and tenure in the program was indefinite, subject only to an annual review. Id. at 224. The Court observed that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that [the prisoners] have a liberty interest in avoiding assignment to [the Supermax]." Id. (citation omitted).

Here, Plaintiff argues that, as a Tier II inmate, he: periodically received less than five hours of exercise per week; lacked working lightbulbs for a month; had restricted access to drinking water when his faucet was broken; and was subject to regular strip searches. (Doc. 94, pp. 6–9.) Plaintiff contends that, like the conditions in Wilkinson, the conditions he experienced in Tier II, "'taken together,' . . . were sufficiently different" than those in the Smith general population such that a jury could consider them to be atypical and significant. (Id. at pp. 6–7 (quoting Wilkinson, 545 U.S. at 224).)

Although there are differences between Tier II and the general population at Smith, the Court finds that the undisputed evidence indicates that, as a matter of law, the conditions Plaintiff experienced in Tier II do not rise to the level necessary to constitute atypical or significant hardship. As an initial matter, lower courts have repeatedly found that the conditions of the Tier II program do not impose an "atypical and significant hardship" upon inmates. See Grier v. Allen, No. 6:18-CV-52, 2019 WL 4440130, at *11 (S.D. Ga. Aug. 15, 2019), adopted by No. 6:18-CV-52, 2019 WL 4420589, at *1 (S.D. Ga. Sept. 16, 2019); Conner v. Allen, No. 6:17-CV-10, 2019 WL 1140211, at *11 (S.D. Ga. Mar. 12, 2019); Gandy, 2019 WL 1085189, at *5; see also Maddox v. Owens, No. 5:15-CV-36(MTT), 2018 WL 1513671, at *5 (M.D. Ga. Mar. 27, 2018). While Plaintiff alleges the conditions that he endured were more severe than those of Tier II generally, the undisputed record before the Court shows that "there is no combination of factors demonstrating that Plaintiff's incarceration in [Tier II] imposed an atypical and significant hardship compared to ordinary prison." Turner v. Warden, GDCP, 650 F. App'x 695, 701 (11th Cir. 2016) (per curiam).

The facts of this case are readily distinguishable from those in Wilkinson, 545 U.S. at 214, 224, and other binding precedent. First, unlike an assignment to the Supermax program, Plaintiff's assignment to Tier II was not indefinite, was evaluated at least several times a year, and there is no evidence that it impacted any eligibility for parole or early release. (See doc. 95.) Additionally, Plaintiff has not pointed to any evidence indicating how the temporary lack of artificial light adversely impacted him or interfered with his ability to function day-to-day. Indeed, even if prison officials at Smith replaced lightbulbs more quickly in general population than in Tier II cells, the at-issue light fixture was not his only source of light; some lights in the common areas of the Tier II building were on 24 hours per day, and each Tier II cell had a window that let in at least some

natural light.[10]  (Doc. 94, p. 9; doc. 94-9, pp. 15–16, doc. 95, p. 4.)  Unlike the 24-hour lights in Wilkinson that interfered with inmates' ability to sleep at night, Plaintiff does not allege that he sat in complete darkness—or any darkness—during the day.  (Doc. 80; doc. 95, p. 4.)

Moreover, Plaintiff does not cite to—and the Court is not aware of—any legal authority holding that decreased access to water amounts to an atypical or significant hardship.  Plaintiff cites to Collier v. Martinez, a case in which the Third Circuit Court of Appeals declined to find a viable procedural due process claim where an inmate lacked *all* access to water for three days.  474 F. App'x 870, 873 (3d Cir. 2012) (per curiam) (finding deprivation of water relevant to Eighth Amendment claim rather than due process).  In this case, however, it is undisputed that Plaintiff received fluids with his meals for the week-long period that his faucet was not functional.  (Doc. 94-7, pp. 6–7.)

As to physical activity, Plaintiff was afforded a maximum of five hours of outdoor exercise per week, while Smith's general population inmates could often exercise outdoors for several hours per day.  (Doc. 95, p. 6.)  The Court in Wilkinson noted that constrained exercise is likely common to all restrictive housing units and facilities, and it must be noted that, unlike the inmates in Wilkinson who were limited to exercising in a small, indoor enclosure, Plaintiff still had access to outdoor recreation during his exercise periods.  545 U.S. at 223–24.  Finally, the regular strip searches were not dramatic departures from ordinary prison life; Tier II inmates were strip-searched every time they left their cells, but all inmates (including those in general population) were strip-searched prior to visitations.  (Doc. 94, p. 8; doc. 94-9, pp. 10–12.)

The conditions in Tier II were undeniably more restrictive than those in general population, but that question is not in dispute; the relevant question is whether the conditions of Plaintiff's

---

[10]  Plaintiff does not dispute that his cell had a window or that he received natural light; however, Plaintiff disputes whether he received a "sufficient amount" of natural light.  (Doc. 95, p. 4.)

segregation were so severe in comparison to general population as to create a protected liberty interest. See Sandin, 515 U.S. at 485. Based on the undisputed record before it, the Court finds that the conditions Plaintiff endured—standing alone or considered in the aggregate—do not impose an atypical and significant hardship within the correctional context. Accordingly, the Court finds that Plaintiff did not have a protected liberty interest in avoiding assignment to the Tier II program, and his procedural due process claim fails as a matter of law. See Moulds v. Bullard, 452 F. App'x 851, 854–55 (11th Cir. 2011) (plaintiff only entitled to procedural due process where deprived of a protected liberty interest).

### (2)    Procedure

Even assuming, however, that Plaintiff has adduced facts to support a deprivation of liberty, Plaintiff cannot show that any Defendant afforded him "constitutionally-inadequate" process. See Grayden, 345 F.3d at 1232. As noted above, Plaintiff first asserts that: Smokes, Godfrey, Williams, and Stanton failed to afford him adequate due process in his assignment to Tier II. (Doc. 80, pp. 19–20.) When an inmate is initially assigned to administrative segregation, prison officials are required to engage in "an informal, nonadversary review of the information supporting [an inmate's] administrative confinement." Hewitt v. Helms, 459 U.S. 460, 472 (1983), overruled on other grounds by Sandin, 515 U.S. at 483. This process requires that the prisoner "merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose . . . ." Id. at 476. Additionally, the conclusions of prison disciplinary bodies must be "supported by some evidence in the record." Williams v. Fountain, 77 F.3d 372, 375 (11th Cir. 1996) (citation omitted). To ascertain whether this standard is satisfied, the Court's inquiry is limited to "whether there is any

evidence in the record that could support the conclusion reached by the disciplinary board" and does not require "examination of the entire record, independent assessment of the credibility of witnesses, or weighing the evidence." Id. (quoting Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455–56 (1985)).

Here, the record shows that Defendants' actions comport with the procedural requirements of the Constitution. After his transfer to Smith on March 25, 2016, Plaintiff was placed in Tier I "pending Tier II assignment" pursuant to a segregation hearing that did not involve any named Defendant. (Doc. 95, p. 9; doc. 94-21, p. 27.) After prison officials at Wheeler investigated Plaintiff's involvement in the fight, Smokes and Godfrey—members of the Classification Committee at Smith—reviewed the documentation stating that Plaintiff was "directly involved" in the incident, admitted to throwing his roommate's property, and was seen fighting another inmate in a video. (Doc. 94-14, p. 3; doc. 94-21, p. 26; doc. 94-20, pp. 3, 7.) On April 4, 2016 the Committee held a hearing to issue its recommendation based on this information. (Doc. 94-22, p. 2.) Plaintiff was present at the hearing and stated that he "was not seen fighting on [any] camera system at Wheeler." (Id.) The Committee recommended he be assigned to Phase 1 of Tier II for "participation as a leader in a major disturbance/disruptive event at Wheeler" and his direct involvement in the fight, and Williams approved the recommendation that same day. (Id.) Plaintiff then submitted a written appeal which was denied by Upton via his Stanton, his designee. (Doc. 94-23, p. 2; doc. 94-13, p. 3.)

This undisputed evidence shows that Plaintiff had two hearings notifying him of the at-issue charges where he was given the "opportunity to present his views" to both the Classification Committee via oral testimony and Upton/Stanton via written objection. See Hewitt, 459 U.S. at 476. Additionally, while Plaintiff argues that there are no recordings of his participation in the

fight and that Defendants should have conducted further investigation to ascertain the validity of the statements in his file, the Committee's decisions were clearly based on "some evidence." See Williams, 77 F.3d at 375. Accordingly, the undisputed facts show that Defendants did not violate Plaintiff's constitutional rights during his initial assignment hearing; Plaintiff may not agree with the outcome, but he received all that due process requires—notice and an opportunity to be heard.

Plaintiff also alleges that Defendants are liable for conducting "sham" reviews that resulted in his continued retention in the Tier II program. (Doc. 80, p. 20.) "Administrative segregation may not be used as a pretext for indefinite confinement of an inmate," and "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." Sheley v. Dugger, 833 F.2d 1420, 1426 (11th Cir. 1987) (quoting Hewitt, 459 U.S. at 477 n.9.) However, like assignment hearings, these periodic reviews do not "require that prison officials permit the submission of any additional evidence or statements." Hewitt, 459 U.S. at 477 n.9. Rather, prison officials may base their decisions on "facts relating to a particular prisoner," their "general knowledge of prison conditions and tensions," and other "administrative considerations." Id.

Here, it is undisputed that Plaintiff received regular seven- and thirty-day contacts and that the Classification Committee issued a recommendation about Plaintiff's status in Tier II every 90 days. (See doc. 94-21.) Plaintiff also received written notice of these decisions and was informed of his right to appeal, an option that he exercised on several occasions. (Doc. 95, pp. 10–11.) Further, the only time the Committee did not recommend that Plaintiff either: (1) move to a higher phase of the program; or (2) remain in his current phase while his release paperwork was reviewed, was in March 2017—the review following Plaintiff's January 2017 disciplinary report. (Doc. 95, pp. 9–12.) Williams approved every recommendation and testified that he forwarded any release recommendations that he received to Upton's office each time he received them. (Doc. 89-1, pp.

1, 8–9.) Said differently, the record shows that Defendants regularly reviewed Plaintiff's status in Tier II and continued to find that Plaintiff's release from Tier II was warranted—dispelling any notions that the reviews were "pretext for indefinite confinement." See Sheley, 833 F.2d at 1422. Accordingly, the record does not establish any violation of Plaintiff's procedural due process rights, and the Court **GRANTS** Defendants' Motion on this issue.[11]

## II.      Qualified Immunity

Even if any of Plaintiff's review hearings did violate the Constitution, Defendants are entitled to qualified immunity because Plaintiff has not shown that any Defendant should have been aware of any clearly established law requiring additional (or different) procedural protections. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "Qualified immunity is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). However, qualified immunity does not protect an official who "knew or reasonably should have known that the action

---

[11] In his Second Amended Complaint, Plaintiff seeks a declaration that Defendants violated his Fourteenth Amendment Rights. (Doc. 80, p. 21.) For the reasons explained throughout this order, however, the Court finds that Plaintiff has not put forth facts that would allow a reasonable jury to find that Defendants violated his constitutional rights, rendering moot Plaintiff's request for declaratory relief.

he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotation marks and alteration omitted).

To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015). Specifically, a defendant must show that he or she "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his [or her] power to utilize." Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004). Here, it is undisputed that Defendants were acting within their discretionary authorities. (Doc. 94, pp. 23–24.) Therefore, Defendants may properly assert the defense of qualified immunity and the burden now shifts to Plaintiff to show that qualified immunity is not appropriate. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Court must grant qualified immunity unless the facts taken in the light most favorable to a plaintiff show (1) that there was a violation of the Constitution; and (2) that the illegality of the defendant's actions was clearly established at the time of the incident. Hoyt, 672 F.3d at 977. The Court has discretion in deciding which of those two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). Importantly, in cases where multiple defendants assert the defense of qualified immunity, the Court must assess qualified immunity "as it relates to [each defendant's] actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018); see Norris v. Williams, 776 F. App'x 619, 622 (11th Cir. 2019) (per curiam) (district court improperly "assumed that each [d]efendant participated in each alleged action" and did not consider individual actions). In this case, the Court has already determined above that, even viewing the evidence in the light most favorable to Plaintiff, Defendants did not commit a constitutional violation.

However, even if it could somehow be said that they did violate the Fourteenth Amendment by depriving Plaintiff of a protected liberty interest without proper procedural protections, it cannot be said that the illegality of their conduct was clearly known at the time of the incident underlying this lawsuit.

"[T]he touchstone of qualified immunity is notice." Bussey-Morice v. Gomez, 587 F. App'x 621, 627 (11th Cir. 2014) (per curiam) (citing Holmes, 321 F.3d at 1078). The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). Under the Eleventh Circuit's framework for applying this step of the qualified immunity analysis, a plaintiff must show that the allegedly violated right was "clearly established" in one of three ways. First, the plaintiff may point to a "materially similar case [that] has already been decided" by the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, affirming the existence of the right and thereby providing fair notice that the at-issue conduct would constitute a violation of the at-issue right. Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012). Second, a broad statement of principle from "a federal constitutional or statutory provision or earlier case law" can provide notice that certain conduct amounts to a constitutional violation where the principle "applie[s] with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of the Defendants' conduct." Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007). Finally, the plaintiff may show that the alleged conduct of the officials was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1292 (11th Cir. 2009). Said differently, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what

defendant is doing violates federal law *in the circumstances*." Wilson v. Blankenship, 163 F.3d 1284, 1288 (11th Cir. 1998) (citation omitted).

Here, Plaintiff has not met this burden. While he correctly asserts that a prisoner's rights to receive an initial hearing and periodic reviews of his confinement in restrictive housing are clearly established, Plaintiff does not cite to any controlling or materially similar case law, identify "a broad legal principle," or otherwise show that any Defendant's individual actions relating to his Tier II confinement amounts to a constitutional violation. See Griffin Indus. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007) (district court erred in denying qualified immunity where plaintiff did not show law was clearly established). The Court's own research has likewise revealed none. Thus, Plaintiff is unable to overcome Defendants' qualified immunity defense, and even if Plaintiff demonstrated facts amounting to a constitutional violation, Defendants are insulated from liability for violations of federal law.

## III.    Attorney's Fees

Plaintiff also requests attorney's fees and expenses of litigation under 42 U.S.C. § 1988. (Doc. 80, p. 21.) A claim for attorney's fees under federal law requires a viable underlying claim. See 42 U.S.C. § 1988 (court may allow "the prevailing party, other than the United States, a reasonable attorney's fee"). Because none of his claims survive summary judgment, Plaintiff's claim for attorney's fees also fail. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants on this claim.

**CONCLUSION**

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment, (doc. 88). The Court **DIRECTS** the Clerk of Court to enter the appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED**, this 20th day of March, 2020.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA